# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 6017 - MDL 1182 | **DATE** | 8/4/2000 |
| **CASE TITLE** | In Re: Synthroid Marketing | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   The court grants final approval of the settlement agreement and awards attorneys' fees to each class counsel in the amount of 10% of the fund each recovered for its respective class; $2,500 per representative consumer plaintiff in this case, and $1,000 per representative consumer plaintiffs in associated cases. The court awards consumer class counsel $764,692 in costs. The court also awards third-party payor class counsel $351,069.98 in fees and expenses and denies its corporate representative plaintiffs any incentive payments. The court also awards Lynde Selden II and Richard H. Rosenthal $39,745.75 in attorneys' fees. Any pending motion in this case is terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | 47 |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | AUG 0 7 2000 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | | 8/4/2000 |
| MPJ | courtroom deputy's initials | ED-7 FILED FOR DOCKETING  00 AUG -4 PM 6: 40 | date mailed notice |
| | | Date/time received in central Clerk's Office | MPJ  mailing deputy initials |

Document Number

839

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE SYNTHROID MARKETING | ) | No. 97 C 6017 |
| LITIGATION | ) | MDL No. 1182 |
|  | ) |  |



DOCKETED

AUG 07 2000

## MEMORANDUM OPINION AND ORDER

Synthroid is a synthetic version of levothyroxine sodium, one
of several levothyroxine drugs used to treat thyroid disorders.
There are eight million users of such drugs in the United States.
The market for these drugs is $600 million a year. Synthroid had
70-90% of this market in the period at issue in this case.
Consumers and third party payors filed this class action lawsuit
against Knoll Pharmaceutical Company (the manufacturer of
Synthroid), BASF Corp., Boots Pharmaceuticals, and individual
defendants, alleging that they concealed or suppressed information
about cheaper bioequivalent drugs, falsely represented that there
were no equivalents, and charged individual consumers and their
insurers more than they would have been able to if the correct
information had been known, in violation of federal antitrust and
racketeering laws and state fraud statutes. The various claims were
consolidated before me under the multi-district litigation statute,
and I certified two classes, one of consumers and one of third

party payors. I rejected an earlier settlement for reasons explained in *In re Synthroid Marketing Litig.*, No. 97 C 6017, M.D.L. 1182, 1998 WL 526566 (N.D. Ill. Aug. 17, 1998)(unreported opinion). The parties now propose a new settlement that they believe substantially corrects the defects I identified there. Because I agree, I grant final approval to the new or Second Settlement.

I.

The terms of the Second Settlement are these. There is a fund established by the defendants in connection with the First (rejected) Settlement that now contains about $106.4 million (the $98 million initially deposited in December 1997 plus interest). The defendants will add an additional $1 million to that existing fund. The consumer class, in exchange for a release from the third party payors of claims for subrogation, reimbursement, and other specified claims, will transfer $20 million to the third party payor class settlement fund. In addition to the $1 million supplement to the existing fund, the defendants will pay an extra $25.5 million to the third party payor class fund, for a total of $45.5 million. The third party payor class recovery will be divided pro-rata based on the number of covered lives per insurer as of January 1995, roughly the mid-point of the class period.

-2-

The consumer class settlement fund is the remaining balance, $87.4 million. In exchange for releasing the defendants from liability for claims associated with fraud and anticompetitive behavior as regards the substitutibility of equivalent thyroid medicines, the consumers will be free from any claims against their shares of the settlement being lodged by the third party payors.

The defendants will also pay over $45 million to the states' attorneys general, and, over the next five years, about $27 million in *cy pres* remedies to the pharmacy industry. The settlement is administered by Gilardi & Co., L.C.C. (the "administrator"), which makes disbursements and handles disputes, and has managed at least 40 settlements in the past 14 years.

Notice has been provided in a number of ways: about 450,000 consumers were notified by direct mail, providing them with a toll-free 1-800 number and a website with frequently asked questions, claims forms (both electronic and paper), and other information.[1] In addition, the administrator and class counsel devised an "attorney call center," a secure website through which class members can contact class counsel and receive callbacks from actual

---

[1] The defendants will pay about $2 million in costs of notice and administration through the consumer class settlement fund, providing a tax deduction to the fund.

-3-

human beings.

Finally, counsel for the third party payor classes has asked for attorneys' fees in the amount of about 22% of the class settlement funds (principal amount plus interest), as well as for expenses, and the consumer class counsel asks for 29% of the consumer settlement amount, plus costs, all of which I reduce to a more reasonable rate, as explained below.

## II.

Federal courts naturally favor the settlement of class action litigation. *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985). Because of "the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority class members," I have a "heavy duty to ensure that any settlement is fair, reasonable, and adequate." *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir. 1985); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). I do find the Second Settlement to be fair, reasonable, and adequate for the reasons explained below.

In evaluating the reasonableness and adequacy of the settlement, it is useful to restate my concerns about the earlier settlement. I was concerned that under the First Settlement "a substantial part--perhaps the greater part. . . of the settlement

-4-

fund may be paid to a different class [than the consumers]." 1998
WL 526566, at *2. That is no longer the case: under the Second
Settlement, the third party payors' settlement is about half the
size of the consumer class settlement. I was also concerned that
the number of claims, in theory as many as 5 million, was unknown,
and it was unclear how much the consumer class members might
receive--perhaps less than $13 a person. *Id.* Now the actual
distribution to the approximately 778,000 consumer settlement class
members with potentially valid claims who have filed will be at
least $84 for each claimant who bought Synthroid before 1995 and
$55 for those who bought it starting in 1995--or more, because I
have reduced the attorneys' fees; that is at least two years of the
price differential between Synthroid and its cheaper competitors.[2]
Moreover, I was unhappy with the notice provided in the First
Settlement--essentially mass audience major publications--which I
thought uninformative, unenlightening, and unhelpfully terse. *Id.*
While notice to a very large class is always a problem, the direct
mailings, toll-free 1-800 numbers, websites, and the attorney call

---

[2] Dr. Jackson Como, Pharm.D., Director of the Drug Information
Practice Residency at the University of Alabama Hospital in
Birmingham, has submitted an affidavit stating that, in his expert
opinion, the average consumer of Synthroid paid between $51 and $91
per year too much for Synthroid over other brands.

center are reasonable steps, and no one has proposed anything that would be demonstrably better here. I was also unhappy with the attorneys' fees, and I still am, but I can use my discretion to adjust the figures to a more reasonable level, and I have done so here.

III.

In assessing the fairness, reasonableness, and adequacy of a class action settlement, I consider: (1) the strength of the plaintiff's case on the merits measured against the terms of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the degree of opposition to the settlement; (4) the presence of collusion in gaining a settlement; (5) the opinion of competent counsel as to the reasonableness of the settlement; and (6) the stage of the proceedings and the amount of discovery completed. *General Electric Capital Corp v. Lease Resolution Corp.,* 128 F.3d 1074, 1082 (7th Cir. 1997).

(1) I begin with the strength of the case balanced against the settlement proposed, basically to make sure the class counsel is not selling out a highly meritorious case. In general, one discounts a possible higher recovery in the event of trial against the cost of litigation and the time value of money, and against the

-6-

odds of losing and ending up with nothing for the class members rather than millions to distribute. *See In re Agent Orange Product Liability Litig.,* 818 F.2d 145, 166 (2d Cir. 1987).

First, the state fraud law claims, including the alleged suppression of a study by Dr. Betty J. Dong, Pharm. D., that the defendants hoped would show that Synthroid had no bioequivalents, but that the plaintiffs argue showed the opposite. The Food and Drug Administration, in part in response to this litigation, is now evaluating whether there really are bioequivalents to Synthroid. I need not decide here whether the state fraud law of Illinois, California, or New Jersey would apply, because all three provide for actual and punitive damages for fraudulent concealment without a showing of actual reliance.

The central questions are whether, if there was wrongful suppression of reliable information about bioequivalents to Synthroid, this caused higher prices and what the damages actually were. The causal chain connecting the purported misinformation to higher prices is long, since there might be various reasons why consumers were prescribed Synthroid even if they or their physicians were aware of the material supposedly concealed, but the chain is not so long that a rational jury might not accept it. For

example, evidence was offered that Synthroid sales declined 10%
after publication of a newspaper article on bioequivalence. Still,
it might go either way. Even if the plaintiffs won on liability,
the size of the damages would be uncertain.

Second, I consider the federal antitrust monopolization claim.
*See* 15 U.S.C. § 2. Liability for a violation of this section
requires a showing of monopoly power in the relevant market and the
employment of unjustifiable means to gain that power. *State of
Illinois ex. rel Burris v. Panhandle Eastern Pipe Line Co.*, 935
F.2d 1469, 1481 (7th Cir. 1991). Synthroid had monopoly power--70
to 90% of the market. The fraud and misrepresentation allegations
would satisfy the unjustifiable means requirement. But the
defendants argue that the plaintiffs are barred from recovery as
indirect purchasers, *see Illinois Brick Co. v. Illinois*, 431 U.S.
720, 745 (1977)(Indirect purchaser recovers nothing.), and this
would not be easy to beat, although it is not slam-dunk.

Third and finally, a claim under RICO, 18 U.S.C. § 1962, is
dicey in the best circumstances. While the RICO claim is colorable,
the Seventh Circuit has looked askance at RICO actions for
misleading statements about smoking where "the injury for which the
plaintiffs seek compensation is remote indeed, the chain of

causation long, . . . and the damages wickedly hard to calculate."
*Int'l B'hood of Teamsters, Local 734, v. Philip Morris Inc.*, 196
F.3d 818, 825 (7th Cir. 1999). There "the 'racketeering acts' . .
. all concern[ed] alleged misstatements . . . [that] were not made
to the [plaintiffs]; they were made to society as a whole, and
affected [the plaintiffs] only because they may have influenced
smokers." *Id. Teamsters* might be distinguishable, but it is a close
question.

In conclusion, in the circumstances, a settlement seems a good
bet for both parties. If the plaintiffs won, as they might, the
defendants would face even more staggering liabilities than under
this settlement agreement. But the plaintiffs might not win, and it
is reasonable for them to settle for less. This is not a sell-out
case.

(2) The complexity, length, and expense of continued litigation
in this case requires no comment. With hundreds of millions of
dollars at stake, complicated legal and factual issues under federal
antitrust and racketeering statutes, as well as under state consumer
fraud laws, the parties would be facing a long and costly fight of
baroque abstruseness.

(3) The degree of opposition to the settlement is small. There have been about 800,000 claims. I have about 15 objections by class members, which lack serious merit. The main objections actually briefed here are offered by the Health Benefit Payers group, nonparties who have been denied leave to intervene, and the Porter Wright Group, insurers represented by the firm of Porter Wright Morris & Arthur, counsel for some unnamed plaintiffs, some parties who have opted out, and some nonparty would-be intervenors.[3] Porter Wright also asks to intervene on its own behalf. The Health Benefits Payers and the insurers that opted out lack standing to object. Nonparties have no standing, and a non-settling party does not have standing to object to a settlement between other parties unless it can show plain legal prejudice. *Agretti v. ANR Freight System, Inc.,* 982 F.2d 242, 246 (7th Cir. 1992). There is no legal prejudice here. However, the Porter Wright Group has standing to object for the class members among its clients who have not opted out.

I do not find the Porter Wright Group objections persuasive. First, under the Second Settlement, contrary to the Porter Wright Group's claims, the administrator does not have unchecked discretion, but a limited mandate, mainly to investigate and verify

---

[3] The Porter Wright Group includes many Blue Cross and Blue Shield insurers.

claims. Moreover, the Porter Wright Group itself admits that the administrator has had experience with 40 settlements in the last four years. Second, the Porter Wright Group objects that the terms of the third party payor settlement are irrational. These require a defendant insurer to have been a third party payor on October 21, 1999, but require such a payor to report covered lives as of January 1, 1995. The Porter Wright Group itself admits that this will make administration of the claim easier, and so is rational and not arbitrary. Third, Porter Wright Group offers an unsupported conclusory allegation that class counsel has failed to adequately represent the interests of the absent members. I have rejected this argument at least three times during this litigation, and do so again here.

Finally, the Second Settlement assesses firms with separate fee agreements for the work done on their behalf by class counsel, which won them tens of millions of dollars. The Porter Wright Group objects, but I do not see why class members should be excused from paying class counsel because they have a separate obligation to outside counsel. The Porter Wright Group, relying upon *Vincent v. Hughes Air West*, 557 F.2d 759 (9th Cir. 1977), argues that under the common fund doctrine, an original claimant cannot shift his

attorneys' fees to third parties who have hired their own attorneys. *See id.* at 770. That, however, was not a properly certified class action. *Id.* at 768. Therefore, "the district court[] [lacked] equitable authority over . . . attorneys' fees under Rule 23," *id.*, something Porter Wright attempts to obscure by importing the bracketed words "class counsel" into the quoted statement of the common fund doctrine in its brief. The dishonesty is worse because it was unnecessary--the present case is indeed a common fund case. *See Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245, 1247 & nn.1 & 2 (7th Cir. 1995). But the Ninth Circuit noted that the rule has exceptions, referring to *Doherty v. Bress*, 262 F.2d 20, 22 (D.C. Cir. 1958) (Court acting in equity can require that a party pay an attorney for winning it a recovery.), and here, when the class counsel has won a recovery, and Porter Wright, as I will explain, has contributed little to that settlement, attorneys' fees are owed to class counsel, whatever Porter Wright may be entitled to under its contract.

Neither is Porter Wright entitled to intervene in this case as a party in its own right or to claim any share of the third party payor class counsel attorneys' fees. Porter Wright does not satisfy the Fed. R. Civ. P. 24 requirements for intervention. Its claims for

-12-

attorneys fees' neither represent an interest in the subject matter of the litigation nor does it have questions of law or fact in common with the main action. In any event, Porter Wright did not do significant work in bringing about the settlement. Its one major attempt to participate actively in the settlement negotiations, a New Orleans meeting of February 1999, was unconstructive. It has not participated in discovery, and the only papers filed with me have concerned its attempts to intervene and claim attorneys' fees. Porter Wright may be entitled to payment under its contract with its clients apart from the settlement, but not under this agreement.

(4) Although the First Settlement was over-hasty, there have been no serious or plausible allegations of collusion between plaintiffs' and defendants' counsel. *See Simer v. Rios*, 661 F.2d 655, 666 (7th Cir. 1981). The possibility of collusion and the reliance interests of absent class members can often constructively be analyzed in terms of the requirement of Rule 23(a)(4) that "the representative parties will fairly and adequately protect the interests of the class," *see Simer*, 661 F.2d at 666 n.20, and since I find the settlement here to be reasonable, fair, and adequate, I hold that there was no collusion.

(5) The opinion of competent counsel as to the reasonableness of the settlement supports approval of the Second Settlement. Class counsel for the plaintiff classes and the representatives of the defendants are all experienced and highly competent. Porter Wright, counsel for the third party payor class member objectors, has a different view, but, as explained, I find its self-interested objections insubstantial.

(6) Finally, I consider the stage of the proceedings and the amount of discovery completed. The First Settlement was presented too early in the process. At this point, however, there has been a great deal of discovery--the docket sheet for this case is over 100 pages long, and most of it involves discovery motions. Hundreds of thousands of pages of documents have been produced and analyzed, and scores of witnesses have been deposed. The case is far enough advanced to warrant this settlement.

IV.

In common fund cases like this, when attorneys obtain a settlement for the class, they petition the court for compensation from the fund. *Cook v. Niedert*, 142 F.3d 1004, 1011 (7th Cir. 1997). The class counsel for the consumer class requests 29% of the recovery for each class in attorneys' fees, or about $26.3 million,

over twice the $12 million in "lodestar" fees they admit to having incurred. Third party payor class counsel asks for $10 million, which it estimates to be 22% of the class fund. Because the payment of attorneys' fees reduces the amount of the common fund, after attorneys secure a settlement, "'their role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit.'" *Id.* (*citing Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988)). This "metamorphosis on the part of counsel" means that "[t]he court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Id.* Fee requests from common funds are subject to "heightened judicial scrutiny". *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583 (3d Cir. 1984). Although I must sustain the incentive for attorneys to continue to represent class clients in cases like this on an "inescapably contingent basis," *Florin*, 60 F.3d at 1247 (internal citations omitted), I must also ensure that the plaintiffs pay no more than what is reasonable. *Cook*, 142 F.3d at 1012.

According to the *Manual for Complex Litigation (Third)*, "[a]n award of attorneys' fees in a common fund case is committed to the

-15-

sound discretion of the trial court, considering the unique factors in the case." The factors used in making the award will vary, but may include:

(1) the size of the fund created and the number of persons benefitted;
(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
(3) the skill and efficiency of the attorneys involved;
(4) the complexity and duration of the litigation;
(5) the risk of nonpayment;
(6) the amount of time devoted to the case by plaintiffs' counsel; and
(7) the awards in similar cases.

*Manual for Complex Litigation* 3d, § 24.121 at 190-91 (1995).

I have appraised most of these factors in determining whether to approve this settlement. Essentially there are two very large funds created and a great many people benefitted; the objections were insubstantial; the class counsel were able and efficient; the litigation was fairly complex but short; the risk of nonpayment was moderate; and the class counsel devoted a fair amount of time to the case, but not a great amount compared to the size of the settlement.

The number of cases involving common funds totaling over $150 million is relatively small. Where the fund is between $100 and $200 million, fees typically range from 4%-10%. *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 886 F. Supp. 445, 462 (E.D.

Pa. 1995). In megafund cases "where extraordinarily large class recoveries of $75-$200 million and more are recovered, courts most stringently weigh the economics of scale inherent in class actions in fixing an appropriate per cent recovery for reasonable fees." *In re Domestic Air Transp. Antitrust Lit.*, 148 F.R.D. 297, 351 (N.D. Ga. 1993)(awarding fees and expenses of 5.25 percent of $305 million). Accordingly, fees in the range of 6-10% and even lower are common in this large scale context. *Id.* (*citing* Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986)).[4]

In much smaller cases, a fee award of 33% does not present the danger of providing the plaintiffs' counsel with the windfall that would accompany a "megafund" settlement of $100 million or upwards.

---

[4] *See, e.g., In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245 (N.D. Ill. 1979) ($200 million class settlement in antitrust price-fixing suit, 6.6% of fund awarded for fees); *In re Corrugated Container Antitrust Litig.*, M. D. L. No. 310, 1983 WL 1872 (S.D. Tex. Sept. 1, 1983), *vacated on other grounds by* 1983 WL 1755 (S.D. Tex. Dec. 16, 1983), ($366 million class recovery, approximately 9% fees and expenses awarded); *Sioux Nation of Indians v. U.S.*, 650 F.2d 244, 249 (Ct. Cl. 1981) ($106 million class recovery, fees of 10% awarded); *In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 529 (D. Nev. 1987) ($205 million plus interest class recovery, 7% fees awarded); *In re "Agent Orange" Prod. Liability Litig.*, 611 F. Supp. 1296, 1394-95 (E.D.N.Y. 1985), *aff'd in part and rev'd in part by* 818 F.2d 226 (2d Cir. 1987), ($180 million class recovery, 5.5% fees awarded); *In re Baldwin-United Corp. Litig.*, M.D.L. 581, 1986 WL 12195, at *3-5 (S.D.N.Y. June 27, 1986) ($183.8 million class recovery, 4.1% fees awarded out of 5% requested).

*In re Greenwich Pharm. Sec. Litig.*, No. 92-3071, 1995 WL 251293, at *7 (E.D. Pa. Apr. 26, 1995). But it is quite different when the figures hit the really big time. The Third Circuit Task Force on Court Awarded Attorney Fees stated that in "'most instances, . . . the expectation [should be] that, absent unusual circumstances, the percentage will decrease as the size of the fund increases.'" *In re Chambers Development Securities Litig.*, 912 F. Supp. 852, 861 (W.D. Pa. 1995). Another judge of this court said that "[w]hile twenty-five or thirty percent might be an appropriate award on a recovery of a million dollars[,] [i]t is likely . . . to result in a windfall where the recovery totals many millions of dollars." *In the Matter of Superior Beverage*, 133 F.R.D. 119, 124 (N.D. Ill. 1990). With huge common funds--over $100 million--a fee award of 29% or even 22% would be an indefensible windfall for the class counsel at the expense of their clients. As the Eastern District of Pennsylvania said, "awarding 20 to 45 percent of [an] $111 million fund in this case would be manifestly unjust." *Unisys.* 886 F. Supp. at 462.

However, class counsel has done a fine job in terms of a speedy and professional resolution of a major class action. Apart from the substantial award to the class members, there are two major benefits

to class counsels' accomplishment: the Dong study has been released so that it may be evaluated to determine whether there are in fact bioequivalents for Synthroid, and, as a result of this litigation, the Food and Drug Administration has begun an analysis of the matter. This may result in a substantial savings to society at large of the cost of this medicine. I accordingly award class counsel attorneys' fees at the high end of the megafund range, or 10% of the class recovery for each class: for the consumer class counsel, about $8.74 million, and for the third party payor class counsel, $4.55 million.   I also award Lynde Selden II and Richard H. Rosenthal $39,745.75 in attorneys' fees for their work on this case.

Class counsel requests an award of some additional funds to be paid from the class settlement funds: consumer class counsel asks for $1,529,385 in litigation costs and expenses, $2,500 per person for the representative plaintiffs in this action as well as $1,000 per person to the named plaintiffs in the associated actions; while third party payor class counsel asks for reimbursement of $531,924.22, and $25,000 as incentive payments to each of the third party payor class representatives on the grounds that "it is unique that major corporations . . . are willing to undertake responsibility and scrutiny that goes with class representation."

I approve the $2,500 per person award for the seven individual representative consumer class plaintiffs and awards of $1,000 per person to the named consumer plaintiffs in the associated actions. I deny the $25,000 per firm in "incentive payments" to major corporations. The cases cited by the third party payors involve awards to individuals who took significant risks, *see Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 188 (S.D.N.Y. 1997)(employment discrimination); *In re First Jersey, Inc. Securities Litig.*, M.D.L. No. 681., 1989 WL 69901 (E.D. Pa. June 23, 1989) (securities), not to corporations who will receive large recoveries in any event.

The other expense award requests from class counsel seem excessive, given the relative economy and efficiency with which class counsel has won a megafund settlement and the paucity of documentation. Because of the difficulty of making a specific ruling on every individual item, *In re Continental Illinois Securities Litig.*, 813 F. Supp. 633, 635 (N.D. Ill. 1993), I may reduce excessive costs and fees by a percentage if I satisfy a "close look" requirement. *Dutchak v. Central States, Southeast and Southwest Areas Pension Fund*, 932 F.2d 591, 597 (1991) (*citing Heiar v. Crawford County*, 746 F.2d 1190, 1204 (7th Cir. 1984)("[T]he judge must do more than eyeball the request and if it seems excessive cut

it down by an arbitrary percentage.")). I have carefully examined the materials submitted for an award of costs, and I find them inflated.

The third party payor class provides me with a list of the "total disbursements of the applicants," accompanied with affidavits stating that the specific claims under them are true. Some of the participating law firms (not all) provide an actual breakdown of their expenses, while others just list undifferentiated expenses for "travel, copying, assessments for PSC." In other instances where there is a breakdown, counsel gives, for example, $10,000 for "cost fund," while another gives $5,000 for "cost fund," which is not an acceptable accounting category if not more fully explained. While travel and expert witness fees are large but ballpark, big expenses in unexplained "copying," "reproduction" (what's the difference?), messenger fees, and the like are not acceptable. I reduce the third party payors' requested expenses by one third, to $351,069.98.

The consumer class counsel asks for $1,529,385 in litigation costs and expenses, and says that "counsel have documented support for all costs incurred and will provide this support to the Court for review if the Court so wishes." It's too late for that. Counsel have divided their claimed expenses into broad categories.

Almost $500,000 is claimed for "travel." Claimed copying expenses constitute another $300,000 for which counsel seek reimbursement. There are also claimed telephone bills of almost $140,000. While some expenses appear reasonable on their face -- the $2,035.30 for service of process, court fees in the amount of $1,880, the mediator's fee of $19,616.60, discovery supplies of $683.83, witness fees of $80.00 -- almost all of the others seem vastly excessive. Accordingly, they are reduced by half, to $764,692.

V.

Therefore, I GRANT final approval of the settlement agreement. I award attorneys' fees to each class counsel in the amount of 10% of the fund each recovered for its respective class. I award $2,500 per representative consumer plaintiff in this case, and $1,000 per representative consumer plaintiffs in associated cases. I award the consumer class counsel $764,692 in costs. I award the third party payor class counsel $351,069.98 in fees and expenses, and deny its corporate representative plaintiffs any incentive payments. All pending motions to intervene, including those of Porter Wright Morris & Arthur and the Health Benefits Payer's Group, are DENIED.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated: August 4, 2000